IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION


**SWANSON B. MILLER,**

     **Plaintiff,**

**vs.**                       **Case No.  1:14cv2-MP/CAS**

**CAROLYN W. COLVIN,**
**Acting Commissioner of the Social**
**Security Administration,**

     **Defendant.**

_____/


## REPORT AND RECOMMENDATION

     This is a Social Security case referred to the undersigned magistrate judge for a report and recommendation pursuant to 28 U.S.C. § 636(b) and Local Rule 72.2(D).  It is now before the Court pursuant to 42 U.S.C. § 405(g) for review of the final determination of the Acting Commissioner (Commissioner) of the Social Security Administration (SSA) denying Plaintiff's application for a period of disability and Disability Insurance Benefits (DIB) filed pursuant to Title II of the Social Security Act (Act).  After consideration of the record, it is recommended that the decision of the Commissioner be affirmed.

## I.  Procedural History

     On January 20, 2009, Plaintiff, Swanson B. Miller, filed an application for DIB, alleging he became unable to work on March 19, 2008, due to knee surgery, diabetes, and back and knee pain.  R. 106, 237-38, 274.  (Citations to the record shall be by the

symbol "R." followed by a page number that appears in the lower right corner.) Plaintiff's date last insured for DIB is December 31, 2013.  R. 106.

Plaintiff's application was denied initially on March 20, 2009, and upon reconsideration on July 20, 2009.  R. 101-02, 106, 124-27, 133-36, 143.  On August 18, 2009, Plaintiff requested a hearing.  R. 106.  On December 2, 2010, Administrative Law Judge (ALJ) Gregory J. Froehlich held a hearing in Gainesville, Florida.  R. 106, 70-100. Plaintiff was represented by Pamela Collins Dunmore, a non-attorney.  R. 70, 72, 106, 138-41.  Plaintiff testified.  R. 73-93, 95-96.  William M. Jenkins, an impartial vocational expert, testified.  R. 106, 94-98,183-85 (Resume).

On December 21, 2010, ALJ Froehlich issued a decision and denied Plaintiff's application for benefits concluding that Plaintiff was not disabled from March 19, 2008, through the date of the ALJ's decision.  R. 114.  On January 13, 2011, Plaintiff requested review of the ALJ's decision.  R. 195.  On September 15, 2011, the Appeals Council granted Plaintiff's request for review, vacated ALJ Froehlich's decision, and remanded the case back to an ALJ to resolve several issues.[1]  R. 120-22.

On April 27, 2012, ALJ Froehlich held a video hearing with Plaintiff appearing in Gainesville, Florida, and the ALJ appearing in Jacksonville, Florida.  R. 20, 37-63. Plaintiff testified.  R. 40-57.  A. Mark Capps, an impartial vocational expert, testified.

---

[1]  The Appeals Council directed an ALJ to obtain additional evidence concerning Plaintiff's impairments, including diabetic neuropathy, in order to complete the administrative record; give further consideration to any treating and non-treating source opinion; give further consideration to the Plaintiff's maximum RFC capacity and provide appropriate rationale with specific references to evidence of record in support of the assessed limitations; and obtain evidence from a vocational expert to determine the effect of the Plaintiff's limitations on the occupational base, and if necessary, determine whether the Plaintiff has transferable skills.  R. 20, 121-22.

R. 20, 57-62, 207 (Resume).  Plaintiff was represented by N. Albert Bacharach, Jr., an

attorney.  R. 39, 138-41.  On June 1, 2012, the ALJ issued a decision and denied

Plaintiff's application for benefits concluding that Plaintiff was not disabled from March

19, 2008, through the date of the ALJ's decision.  R. 31.  Plaintiff requested review of

the ALJ's decision, but the Appeals Council denied review on November 7, 2013,

making the ALJ's decision the final decision of the Commissioner.  R. 1-4, 7-8; *see* 20

C.F.R. § 404.981.

On January 7, 2014, Plaintiff filed a Complaint with the United States District

Court seeking review of the ALJ's decision.  Doc. 1. The parties filed memoranda of law,

docs. 13 and 14, which have been considered.

## II.  Findings of the ALJ

The ALJ made several findings relative to the issues raised in this appeal:

1. "The claimant has not engaged in substantial gainful activity since March 19, 2008, the alleged onset date."  R. 22.

2. "The claimant has the following severe impairments: osteoarthritis of the knees, status post knee surgery, diabetes mellitus with neuropathy, degenerative disc disease of the lumbar spine, and history of right wrist injury."  R. 23.

3. "The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1."  *Id.*

4. "[T]he claimant has the residual functional capacity [RFC] to perform medium work as defined in 20 CFR 404.1567(c).  The claimant is able to occasionally lift and carry 50 pounds, and he is able to frequently lift and carry 25 pounds. He is able to sit, stand or walk for six hours out of an eight-hour workday.  He needs the option to sit or stand, within his assigned workstation, every 45 minutes.  He has occasional postural restrictions.  He is limited to frequent handling on the right.  He may not have concentrated exposure to vibrations. He is not able to work around moving, mechanical parts or work at unprotected heights."  *Id.*

5.  "The claimant is unable to perform any past relevant work" as a carpenter, construction (semi-skilled, medium exertion) and forklift operator (semi-skilled, medium exertion).  R. 29.

6.  "The claimant was born on August 21, 1961 and was 46 years old, which is defined as a younger individual age 18-49, on the alleged onset date. The claimant subsequently changed age category to closely approaching advanced age." *Id.*

7.  "The claimant has at least a high school education and is able to communicate in English." *Id.*

8.  "Considering the claimant's age, education, work experience, and [RFC], there are jobs that exist in significant numbers in the national economy that the claimant can perform." R. 30.  The ALJ determined that the Plaintiff's ability to perform all or substantially all of the requirements for a full range of medium work has been impeded by additional limitations. *Id.*  The ALJ asked the vocational expert whether jobs exist in the national economy for an individual with Plain tiff's profile.  R. 58-60.  The vocational expert opined that representative occupations included warehouse checker (unskilled, light exertion); assembler, small products (unskilled, light exertion); and ticket taker (unskilled, light exertion).  *Id.*  Each of these jobs has a specific vocational preparation (SVP) of 2.  *Id.*  The vocational expert opined that these jobs are done sitting and standing at times.  R. 60.[2]

9.  "The claimant has not been under a disability, as defined in the Social Security Act, from March 19, 2008, through the date of" the ALJ's decision.  R. 31.

## III.  Legal Standards Guiding Judicial Review

---

[2] "Unskilled work is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time."  20 C.F.R. §§ 404.1568(a), 416.968(a).  "Specific Vocational Preparation is defined as the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." Dictionary of Occupational Titles (DOT) (4th Ed., Rev. 1991), Appendix C: Components of the Definition Trailer, § II, SVP.  An SVP of 1 means a "[s]hort demonstration only." An SVP of 2 means "[a]nything beyond short demonstration up to and including 1 month."  *Id.*  "Light work" is defined as "involv[ing] lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  20 C.F.R. § 404.1567(b).

This Court must determine whether the Commissioner's decision is supported by substantial evidence in the record and premised upon correct legal principles. 42 U.S.C. § 405(g); <u>Chester v. Bowen</u>, 792 F.2d 129, 131 (11th Cir. 1986). "Substantial evidence is more than a scintilla, but less than a preponderance. It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." <u>Bloodsworth v. Heckler</u>, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); <u>accord</u> <u>Moore v. Barnhart</u>, 405 F.3d 1208, 1211 (11th Cir. 2005). "The Commissioner's factual findings are conclusive if supported by substantial evidence." <u>Wilson v. Barnhart</u>, 284 F.3d 1219, 1221 (11th Cir. 2002) (citations omitted). The court may not reweigh the evidence or substitute its own judgment for that of the ALJ even if it finds that the evidence preponderates against the ALJ's decision. <u>Moore</u>, 405 F.3d at 1211.[3]

"In making an initial determination of disability, the examiner must consider four factors: '(1) objective medical facts or clinical findings; (2) diagnosis of examining physicians; (3) subjective evidence of pain and disability as testified to by the claimant and corroborated by [other observers, including family members], and (4) the claimant's age, education, and work history.'" <u>Bloodsworth</u>, 703 F.2d at 1240 (citations omitted).

---

[3] "If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it." <u>Phillips v. Barnhart</u>, 357 F.3d 1232, 1240, n.8 (11th Cir. 2004) (citations omitted). "A 'substantial evidence' standard, however, does not permit a court to uphold the Secretary's decision by referring only to those parts of the record which support the ALJ. A reviewing court must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ." <u>Tieniber v. Heckler</u>, 720 F.2d 1251, 1253 (11th Cir. 1983). "Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'" <u>Cowart v. Schweiker</u>, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

A disability is defined as a physical or mental impairment of such severity that the claimant is not only unable to do past relevant work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).  A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *see* 20 C.F.R. § 404.1509 (duration requirement).  Both the "impairment" and the "inability" must be expected to last not less than 12 months.  Barnhart v. Walton, 535 U.S. 212 (2002).  In addition, an individual is entitled to DIB if he is under a disability prior to the expiration of his insured status.  *See* 42 U.S.C. § 423(a)(1)(A); Moore v. Barnhart, 405 F.3d at 1211; Torres v. Sec'y of Health & Human Servs., 845 F.2d 1136, 1137-38 (1st Cir. 1988); Cruz Rivera v. Sec'y of Health & Human Servs., 818 F.2d 96, 97 (1st Cir. 1986).

The Commissioner analyzes a claim in five steps.  20 C.F.R. § 404.1520(a)(4)(i)-(v).

1.      Is the individual currently engaged in substantial gainful activity?

2.      Does the individual have any severe impairments?

3.      Does the individual have any severe impairments that meet or equal those listed in Appendix 1 of 20 C.F.R. Part 404, Subpart P?

4.      Does the individual have the RFC to perform work despite limitations and are there any impairments which prevent past relevant work?[4]

---

[4]  A residual functional capacity (RFC) is the most a claimant can still do despite limitations.  20 C.F.R. § 404.1545(a)(1).  It is an assessment based upon all of the relevant evidence including the claimant's description of her limitations, observations by

5.       Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of

the application for benefits.  A positive finding at step three results in approval of the

application for benefits.  At step four, the claimant bears the burden of establishing a

severe impairment that precludes the performance of past relevant work.  Consideration

is given to the assessment of the claimant's RFC and the claimant's past relevant work.

If the claimant can still do past relevant work, there will be a finding that the claimant is

not disabled.  If the claimant carries this burden, however, the burden shifts to the

Commissioner at step five to establish that despite the claimant's impairments, the

claimant is able to perform other work in the national economy in light of the claimant's

RFC, age, education, and work experience.  Phillips, 357 F.3d at 1237; Jones v. Apfel,

190 F.3d 1224, 1229 (11th Cir. 1999); Chester, 792 F.2d at 131; MacGregor v. Bowen,

786 F.2d 1050, 1052 (11th Cir. 1986); 20 C.F.R. § 404.1520(a)(4)(v), (e) & (g).  If the

Commissioner carries this burden, the claimant must prove that he or she cannot

perform the work suggested by the Commissioner.  Hale v. Bowen, 831 F.2d 1007,

1011 (11th Cir. 1987).

As the finder of fact, the ALJ has the duty to evaluate all the medical opinions in

the record and resolve conflicts that appear.  20 C.F.R. § 401.1527.  The following

factors apply for determining the weight to give to any medical opinion: (1) the

frequency of examination and the length, nature, extent of the treatment relationship; (2)

the evidence in support of the opinion, in particular, "[t]he more a medical source

---

treating and examining physicians or other persons, and medical records.  *Id.*  The
responsibility for determining claimant's RFC lies with the ALJ.  20 C.F.R.
§ 404.1546(c).

presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight" that opinion is given; (3) the opinion's consistency with the record as a whole; (4) whether the opinion is from a specialist and, if it is, it will be accorded greater weight; and (5) other relevant but unspecified factors.  20 C.F.R. § 404.1527(b) & (c).

The opinion of the claimant's treating physician must be accorded considerable weight by the Commissioner unless good cause is shown to the contrary.  Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997).  This is so because treating physicians "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations."  20 C.F.R. § 404.1527(c)(2).  "This requires a relationship of both duration and frequency."  Doyal v. Barnhart, 331 F.3d 758, 762 (10th Cir. 2003).  "'The treating physician doctrine is based on the assumption that a medical professional *who has dealt with a claimant and his maladies over a long period of time* will have a deeper insight into the medical condition of the claimant than will a person who has examined a claimant but once, or who has only seen the claimant's medical records.'  *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994) (emphasis added)."  *Id.*

> As the Supreme Court recently observed, "the assumption that the opinions of a treating physician warrant greater credit that [sic] the opinions of [other experts] may make scant sense when, for example, the relationship between the claimant and the treating physician has been of short duration."  *Black & Decker Disability Plan v. Nord*, [538 U.S. 822, 832 (2003)].  Moreover, a longstanding treatment relationship provides some assurance that the opinion has been formed for purposes of treatment and not simply to facilitate the obtaining of benefits.

A physician's opinion is therefore not entitled to controlling weight on the basis of a fleeting relationship, or merely because the claimant designates the physician as her treating source.  Absent an indication that an examining physician presented "the *only* medical evidence submitted pertaining to the relevant time period," the opinion of an examining physician who only saw the claimant once is not entitled to the sort of deferential treatment accorded to a treating physician's opinion.  *Reid v. Chater*, 71 F.3d 373, 374 (10th Cir. 1995) (emphasis added).

Doyal, 331 F.3d at 762-63.

The reasons for giving little weight to the opinion of the treating physician must be supported by substantial evidence, Marbury v. Sullivan, 957 F.2d 837, 841 (11th Cir. 1992), and must be clearly articulated.  Phillips, 357 F.3d at 1241.  "The Secretary must specify what weight is given to a treating physician's opinion and any reason for giving it no weight, and failure to do so is reversible error."  MacGregor, 786 F.2d at 1053.

The ALJ may discount a treating physician's opinion report regarding an inability to work if it is unsupported by objective medical evidence and is wholly conclusory.  Edwards v. Sullivan, 937 F.2d 580, 583-84 (11th Cir. 1991).  Stated somewhat differently, the ALJ may discount the treating physician's opinion if good cause exists to do so.  Hillsman v. Bowen, 804 F. 2d 1179, 1181 (11th Cir. 1986).  Good cause may be found when the opinion is "not bolstered by the evidence," the evidence "supports a contrary finding," the opinion is "conclusory" or "so brief and conclusory that it lacks persuasive weight," the opinion is "inconsistent with [the treating physician's own medical records," the statement "contains no [supporting] clinical data or information," the opinion "is unsubstantiated by any clinical or laboratory findings," or the opinion "is not accompanied by objective medical evidence."  Lewis, 125 F.3d at 1440; Edward, 937 F.2d at 583 (citing Schnorr v. Bowen, 816 F.2d 578, 582 (11th Cir. 1987)).  Further, where a treating physician has merely made conclusory statements, the ALJ may afford

them such weight to the extent they are supported by clinical or laboratory findings and are consistent with other evidence as to a claimant's impairments.  <u>Wheeler v. Heckler</u>, 784 F.2d 1073, 1075 (11th Cir. 1986).

Further, the credibility of the claimant's testimony must also be considered in determining if the underlying medical condition is of a severity which can reasonably be expected to produce the alleged pain.  <u>Lamb v. Bowen</u>, 847 F.2d 698, 702 (11th Cir. 1988).  After considering a claimant's complaints of pain, an ALJ may reject them as not credible.  *See* <u>Marbury</u>, 957 F.2d at 839 (citing <u>Wilson v. Heckler</u>, 734 F.2d 513, 517 (11th Cir. 1984)).  If an ALJ refuses to credit subjective pain testimony where such testimony is critical, the ALJ must articulate specific reasons for questioning the claimant's credibility.  *See* <u>Wilson</u>, 284 F.3d 1225.  Failure to articulate the reasons for discrediting subjective testimony requires, as a matter of law, that the testimony be accepted as true.  *Id.*

Pain is subjectively experienced by the claimant, but that does not mean that only a mental health professional may express an opinion as to the effects of pain.  One begins with the familiar way that subjective complaints of pain are evaluated:

> In order to establish a disability based on testimony of pain and other symptoms, the claimant must satisfy two parts of a three-part test showing:  (1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain.

<u>Wilson</u>, 284 F.3d at 1225.  *See* 20 C.F.R §§ 404.1529 (explaining how symptoms and pain are evaluated); 404.1545(e) (regarding RFC, total limiting effects).  The ALJ may consider a claimant's daily activities when evaluating subjective complaints of disabling pain and other symptoms.  <u>Macia v. Bowen</u>, 829 F.2d 1009, 1012 (11th Cir. 1987); 20

C.F.R. § 404.1529(c)(3)(i).  *But see* <u>Lewis v. Callahan</u>, 125 F.3d 1436, 1441 (11th Cir. 1997) ("participation in everyday activities of short duration, such as housework or fishing" does not disqualify claimant from disability).

## IV.  The Evidence

In the memorandum submitted to this Court, Plaintiff provides a cursory review of the evidence, essentially quoting from several treatment notes.  Doc. 13 at 5-14. Plaintiff challenges the ALJ's determination not to give great weight to the opinion of Oscar DePaz, M.D., doc. 13 at 20-27, and the ALJ's consideration of Plaintiff's credibility regarding his subjective complaints of pain, doc. 13 at 28-32.  Plaintiff quotes from ALJ Froehlich's decision after remand, doc. 13 at 15-19, but selectively refers to portions of the decision pertaining to the RFC determination and conclusions reached by the ALJ, omitting most of the ALJ's discussion of the medical evidence, *see* R. 24-29.  Further, Plaintiff does not take issue with specific factual findings or argue that the ALJ did not comply with the remand from the Appeals Council.  Doc. 13.

In its memorandum, the Commissioner provides a statement of facts that includes a brief summary of the ALJ's findings.  Doc. 14 at 2-3.  In the argument portion of the memorandum, the Commissioner set forth medical and other evidence which the Commissioner argues supports the ALJ's decision.  Doc. 14 at 4-12.

Notwithstanding its length, the ALJ's consideration of the medical and other evidence that support his RFC findings and serve as factual predicates for his ultimate conclusion that Plaintiff is not disabled is set forth below with supporting record citations in brackets:

> Mr. Miller testified that he mowed a couple of yards in September 2011 and was paid $30 for one and $55 for the other.  [R. 40-41]  The claimant said he has a

herniated disc and suffers from sciatic nerve pain.  He believes he is able to sit for 45 minutes, stand for 45 minutes and walk one block.  Mr. Miller said he could lift and carry five pounds.  [R. 42]  He reported having sharp pain in the back of his legs that can be 8/10 in intensity.  [R. 43-44, 85]  His pain medications work, but they cause constipation and drowsiness.  [R. 43, 46, 52-53, 84]  He is sluggish and unable to focus for two or three hours after taking his medication.  Mr. Miller said he is currently enrolled in physical therapy, but he cannot tell if it is helping.  He spends his days lounging in the recliner.  [R. 86, 90, 92]  He does the dishes, folds towels, vacuums a small area, and pulls a few weeds.  He drives to the convenience store, but he does not shop for groceries.  He sleeps during the day due to his pain medications.  [R. 47-49]

After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.[5]

The claimant is 6'2" tall, and he weighs 248 pounds.  His BMI (body mass index) is 31.8 making him obese.  I have considered the claimant's obesity, its effect upon the claimant and how it contributes to the severity of his symptoms.  (SSR02-1P)  The claimant's obesity has been considered in formulating the residual functional capacity.  Specifically, the claimant's obesity has provided some support for the claimant's allegations and has precluded work at a higher exertional level than the one that might otherwise be suggested by the medical evidence.  Dr. Chodosh suggested that the claimant could perform a higher exertional level of work, but did not provide an analysis of the effects of obesity.  Considering the evidence as a whole, I find that the claimant is able to perform a reduced range of medium work.

I have carefully read and considered all the evidence regardless of whether a particular exhibit is specifically cited in the decision.

An MRI of the claimant's right wrist done on May 7, 2008 revealed a small full thickness tear of the scapholunate ligament, mild degenerative change of the radial column of the carpal bone, and minimal grade I chondromalacia.  [R. 344-45] (Exhibit 2F)

On March 6, 2008, the claimant conferred with James Berk, M.D.  Mr. Swanson [sic] reported injuring his right wrist at work.  [R. 367]  Imaging studies revealed that there were no acute fractures, dislocations, or soft tissue abnormalities.  [*Id.*]  Dr. Berk's assessment was right wrist pain, suspect mild tendinitis involving the extensor tendons and possibly collateral ligaments of the right wrist.  [*Id.*]  When seen on May 12, 2008, the claimant continued to complain of right wrist pain.

---

5  Plaintiff argues that the ALJ's use of this boilerplate language is erroneous.  Doc. 13 at 28-31.

[R. 365]  The claimant's MRI revealed a small scapholunate full thickness tear at the scaphoid attachment.  There was minimal degenerative change in the radial column of the carpal bones.  Grade I chondromalacia was noted along the proximal articular surface of the hamate and triquetrum.  When examined, there was no effusion, and the claimant had full range of motion.  He did have tenderness along the lunate and capitates region with direct palpation.  There was no tenderness along the distal radius.  The claimant was referred to a hand surgeon and continued on light duty at work.  The claimant was advised to return if necessary.  [*Id.*]  (Exhibit 3F)

On May 21, 2008, the claimant met with Rodger Powell, M.D., a board certified orthopedic surgeon.  [R. 362-64]  Mr. Swanson's [sic] complaint was right wrist pain.  Dr. Powell examined the claimant and ordered x-rays, which showed no evidence for significant arthritis except at the MP (metacarpophalangeal) joint of the thumb, which was pre-existing.  Dr. Powell's impression was scapholunate ligament strain.  Dr. Powell referred the claimant to hand therapy for strengthening and endurance training.  Dr. Powell continued the claimant on light duty noting that the claimant would be able to return to full duty shortly.  [R. 364]  At a follow up visit on July 30, 2008, the claimant admitted that he was able to use his right wrist for light activities.  Dr. Powell noted that a functional capacity evaluation found that the claimant could work at medium exertion.  [R. 359]  (Exhibit 3F)

Vocational Rehabilitation referred the claimant to Oscar DePaz, M.D. of Southeastern Rehabilitation.  [R. 562-68]  At his initial appointment on June 2, 2009, the claimant reported low back pain, bilateral knee pain, right shoulder pain, and right wrist pain.  [R. 562]  Mr. Swanson [sic] said he had no problems with self-care.  [R. 563]  There were multiple pain behaviors including posturing, guarding and expressing verbally.  [R. 562]  The claimant said that his ultimate goal was to pass the hairdresser-licensing exam so that he could work with his wife in her salon.  [R. 564]  He said he was laid off from his last job when the ownership changed.  At a follow up appointment with Dr. DePaz on July 15, 2009, the claimant said he got partial pain relief from Hydrocodone, but he wanted something stronger.  [R. 569-70]  He said that Mobic gave him no pain relief.  He denied having any side effects from these medications.  [R. 569]  Dr. DePaz said the claimant exhibited multiple pain behaviors and walked with a straight cane.  [*Id.*]  The claimant's medications were adjusted, and he was referred for knee braces.  [R. 570]  An x-ray of the claimant's right knee performed on July 21, 2009 revealed patellofemoral and medial compartment chondromalacia characterized by near bone-on-bone relationship in the medial compartment and moderate narrowing of the patellofemoral compartment.  There were only minor osteoarthritic changes involving the two compartments.  Joint effusion was present.  [R. 558]  At a follow up appointment on August 17, 2009, the claimant was restarted on Lortab.  The claimant said he wanted to attend school to become a barber.  [R. 554-55]  When he returned on September 28,

2009, the claimant requested refills.  He reported good results from Naprosyn.  His mood was euthymic, and he was walking without an assistive device.  [R. 534-35] (Exhibit 13F)

At a follow up appointment with Dr. DePaz on November 16, 2009, the claimant said his medications were working well.  [R. 532]  He denied having any side effects.  Mr. Miller was in no acute distress, and he walked without all assistive device. Lortab and Naproxen were continued.  [*Id.*]  On December 24, 2009, the claimant told Dr. DePaz that he took half a Lortab before going to work, and it was helpful.  [R. 548]  The examination of the claimant's knee revealed no effusion, but there was persistent tenderness.  The range of motion was functional.  [*Id.*]  On February 24, 2010, the claimant said the Naproxen worked well to keep the inflammation down, and the Lortab helped with pain.  Range of motion in the knee was functional.  [R. 546]  On June 15, 2010, the claimant reported that he was doing well until he fell in the yard three weeks earlier.  He denied any problems with medication side effects.  [R. 545] (Exhibit 14F)

On June 24, 2009, the claimant had x-rays of his lumbar spine.  [R. 510]  They revealed degenerative disc disease at L5/S1, mild anterolisthesis of L4 on 5 of about 3 mm, suspected underlying pars defect, and bilateral renal calculi.  X-rays of the claimant's left knee revealed osteoarthritis, but no acute osseous abnormality.  [R. 509] (Exhibit 8F)

The claimant continued treatment with Dr. DePaz.  On January 5, 2011, the claimant said that he was having good control of the numbness and tingling in his lower extremities with the addition of Neurontin at night.  He said that the Neurontin kept him drowsy until about one or two o'clock in the afternoon.  The claimant was wearing knee braces.  Pain behaviors were observed with position changes.  [R. 586-87][6]  On May 2, 2011, the claimant reported that his low back pain and knee pain were uncontrolled.  [R. 581]  He said Percocet made him sleepy and interfered with his ability to drive.  He denied any bowel or bladder dysfunction or changes in gait.  Multiple pain behaviors were observed.  At his request, the claimant was restarted on Hydrocodone and Naprosyn.  On July 15, 2011, the claimant reported that he was stable on Hydrocodone and Naprosyn.  [R. 579]  He said he had resumed working side jobs to help with bills.  Multiple pain behaviors were observed.  X-rays of the claimant's hands done on October 11, 2011 revealed bilateral hand and wrist osteoarthritis, mostly mild.  [R. 578]  On March 13, 2012, the claimant reported that he had scheduled an appointment with an orthopedist pursuant to Dr. DePaz's referral.  [R. 572-73]  Physical therapy was offered, and the claimant agreed to the referral.  The claimant did

---

 6  On March 4, 2011, Plaintiff followed-up with Dr. DePaz for his low back pain and knee pain. R. 585.  His diabetes was under control; he lost 40 pounds; he stated he needed a stronger pain medication as the Lortab was no longer helping.  *Id.*  His mood was depressed; affect appropriate.  *Id.*  He was prescribed a trial of Percocet as needed and Mobic for knee pain.  Hydrocodone was discontinued; Gabapentin continued.  R. 586.

not disclose any side effects from his medications.  He walked with an antalgic gait.  He walked with a straight cane.  When examined, there was painful range of motion of the lumbar spine.  There was tenderness in the lumbosacral region in a diffuse manner.  The claimant was neurologically intact.  The claimant was advised to continue wearing knee braces.  Hydrocodone and Naprosyn were continued.  [R. 573] (Exhibit 16F)

An x-ray of the claimant's left knee done on April 4, 2012, revealed moderate tricompartmental osteoarthritis of the left knee.  An x-ray of the right knee revealed tricompartmental degenerative change, most notable in the medial compartment.  There was a small joint effusion.  [R. 628-30] (Exhibit 17F)

On March 23, 2012, the claimant participated in a physical therapy intake interview.  Mr. Miller said that hot showers and riding a bicycle, relieved his low back pain.  At the beginning of his session on March 30, 2012, the claimant reported that he was not in any pain.  He said he was moving heavy rocks the day before while doing yard work.  On April 4, 2012, the claimant said he had increased pain after biking with his family.  On April 6, 2012, the claimant reported having no back pain before or after his 50-minute physical therapy session.  On April 11, 2012, the claimant said he attempted to work out every day.  He said he was consistent with his home exercise program.  On April 13, 2012, the claimant said he had been spending a lot of time gardening, but he was sitting while he gardened.  [R. 644-64] (Exhibit 18F)

On March 18, 2009, the claimant participated in a consultative physical evaluation with Lance I. Chodosh, M.D.  [R. 488-96]  The claimant said he was independent in his activities of daily living and was able to drive short distances.  The claimant reported that he was taking a single medication for diabetes and OTC (over the counter) analgesics.  [R. 488]  The claimant was 6'2" tall, and he weighed 248 pounds.  His blood pressure was 110/80.  [R. 489]  The claimant exhibited moderate pain behavior.  The examination of the claimant's back revealed no deformity or paraspinal muscular spasm.  It was tender to very light touch in the lumbar region.  The straight leg raise was negative while sitting.  The straight leg raise could not be assessed while supine due to pain behavior.  The claimant's muscle strength was 5/5 throughout.  His manual dexterity was normal.  His standing balance and gait were normal.  He was able to heel and toe walk.  [R. 490]  Dr. Chodosh opined that there were no signs of significant impairment.[7]  Dr. Chodosh opined that the claimant could stand, walk, sit, stoop, squat, kneel, and lift and carry objects normally.  [R. 491]  (Exhibit 5F)  Substantial weight is given to this assessment because it is consistent with the greater weight of the evidence which shows the claimant's ability to drive, garden, cut grass, and do light housework.

---

[7]  Dr. Chodosh's impressions/comments included: "Chronic pain in various areas, including the back, knees, and right wrist.  I do not find signs of significant physical impairment."  R. 491.

On June 26, 2009, the claimant participated in a consultative physical evaluation with Robert Greenberg, M.D.  [R. 512-15]  The claimant reported problems with bilateral knee pain, low back pain, and pain in the right upper extremity. Dr. Greenberg opined that the claimant was not putting forth full effort with regard to strength testing and range of motion testing.  [R. 515]  With that in mind, Dr. Greenberg wrote that the claimant had decreased range of motion of the hips, knees, and lumbar spine.  There was full range of motion of the other joints. [*Id.*]  There was pain on range of motion of the hips, knees and lumbar spine as well as pain on palpation of the knees; however, there was no swelling, redness or evidence for active, inflammatory arthritis.  Fine manipulation of the claimant's hands was normal.  Dr. Greenberg said the claimant "complained bitterly" of pain. Dr. Greenberg opined that the claimant's complaints were out of proportion to the physical findings.  [*Id.*]  (Exhibit 9F)  Substantial weight is given to this assessment because it is consistent with the greater weight of the evidence, which shows that the claimant has functional motion in his knees, mild to moderate degenerative changes in his lumbar spine, and full strength in his extremities.

On July 17, 2008, the claimant participated in a functional capacity evaluation with Debbi Shon, MPT.  When tested, the claimant was able to lift 40 pounds to shoulder height and 25 pounds overhead.  He carried 50 pounds.  Mr. Swanson [sic] was able to sit, stand and walk for continuous intervals.  Ms. Shon opined that the claimant could perform a reduced range of medium work.  (Exhibit 4F) [R. 451-58]  Significant weight is given to this opinion because it is consistent with the greater weight of the evidence.  The claimant's ability to drive, shop, cook and do yard work is consistent with medium work.

On September 19, 2008, Dr. Powell completed a form stating that the claimant reached maximum medical improvement as of August 6, 2008.  Dr. Powell agreed with the functional capacity evaluation finding that the claimant could work at medium exertion.  [R. 425, 459] (Exhibit 4F)  Controlling weight is given to this opinion because it is consistent with the treatment records, and it is consistent with the medical evidence of record.  The imaging studies, physical examinations, and the claimant's activities of daily living are consistent with the ability to perform a reduced range of medium work.

On July 17, 2009, Marc Tafflin, D.O., a consultant for Disability Determination Services (DDS) completed a residual functional capacity assessment.  Dr. Tafflin opined that the claimant could work at light exertion with no climbing of ladders, ropes or scaffolds and occasional restrictions for the remaining postural maneuvers.  Dr. Tafflin opined that the claimant should avoid concentrated exposure to vibration and hazards.  [R. 516-523] (Exhibit 10F)  Some weight is given to this opinion because it is consistent with the greater weight of the evidence, which shows that the claimant is able to work at substantial gainful activity levels.  However, the greater weight of the evidence, which includes the

treatment records, and the claimant's activities of daily living, shows that the claimant is able to perform a reduced range of medium work.

On April 30, 2012, Dr. DePaz completed a residual functional capacity form. [R. 672-80] He said the claimant could sit for 30 minutes at a time for a total of three to four hours per day, five days a week. [R. 673] Dr. DePaz opined that the claimant could stand for 30 minutes at a time for up to one hour a day, five days a week. Dr. DePaz said the claimant could work three to four hours a day if he had a sit/stand option. [*Id.*] According to Dr. DePaz, the claimant could occasionally lift and carry 10 to 15 pounds and could frequently lift and carry five to nine pounds. [R. 674] Dr. DePaz wrote that the claimant has chronic low back pain due to spondylosis and knee pain due to arthritis. He added that the claimant has advanced diabetes mellitus. [*Id.*] Dr. DePaz checked boxes stating that the claimant has repeatedly reported pain, that the claimant would be expected to experience pain with his diagnoses, and that the claimant's pain is somatogenic. Dr. DePaz said the claimant had a chronic pain syndrome and was medicated for pain. Dr. DePaz said he prescribed opioid and non-opioid medications which caused sedation and constipation. Dr. Paz [sic] said the claimant reported marked pain rated as 6-7/10. Dr. DePaz rated the claimant's pain as marked with pain at 6-7/10. [R. 677-78] Dr. DePaz opined that the claimant's pain would cause marked problems in the claimant's ability to maintain attention and concentration and marked problems with the ability to interact with the public. [R. 679] Dr. DePaz opined that the claimant would have extreme limitations in the ability to perform activities within a schedule and the ability to complete a normal workday and workweek without interruptions from pain. Dr. DePaz wrote that "It is my opinion this patient is non-employable." [R. 680] (Exhibit 20F) Little weight is given to this opinion, which was obtained after the hearing was concluded. [The second hearing was concluded on April 27, 2012. R. 37] This opinion is inconsistent with opinions from other sources that find that the claimant is able to do medium work. Dr. DePaz assessed pain levels in the opinion despite the fact that he never did so in his treatment notes. Dr. DePaz stated in the opinion that he treated the claimant for a chronic pain syndrome, but this treatment is not documented in the treatment notes. In general, the limitations given do not match what has been recorded in the treatment notes. Additionally, Dr. DePaz's opinion is inconsistent with the activities that the claimant disclosed to his physical therapist such as gardening, working out and biking.

The medical evidence of record does not support the claimant's assertion that he is disabled. The imaging studies of the claimant's back show only mild to moderate degenerative changes. The claimant reported good symptom relief when using Hydrocodone and Naprosyn. He told Dr. DePaz that Neurontin caused him to be sleepy until early afternoon. The claimant testified that his medications caused drowsiness and constipation, but he did not report these

issues to Dr. DePaz.[8]  The claimant told Dr. DePaz that he had Medicaid, but there is little evidence that the claimant sought treatment for his diabetes and related symptoms, which is counterintuitive to his claim of disability.  The medical evidence of record supports the finding that the claimant is able to perform a reduced range of medium work.

The claimant saw Dr. Berk and Dr. Powell, an orthopedist and an orthopedic surgeon respectively, for his wrist injury.  He was treated and discharged from both practices.  Dr. Powell opined that the claimant could work at medium exertion.  The claimant was treated by Dr. Depaz [sic], a rehabilitation specialist.  After the second hearing, Dr. DePaz opined that the claimant is disabled which contradicts the treatment notes in general and specifically from May [sic] [June] 2010 when the claimant said he had been doing well until he fell in the yard.  When examined that day, the claimant had functional range of motion in the knee, and there was no edema.  That opinion has been discounted because it is

---

8   On July 15, 2009, Dr. DePaz provided a "medication review of systems" and noted: "Tramadol caused headache.  No nausea, vomiting, diarrhea, abdominal pain, chest pain, shortness of breath, itching, rashes, hives or constipation.  Mobic seems to be well tolerated but he gets no pain relief from it."  Plaintiff reported relief from Hydrocodone, but could benefit from something stronger.  Dr. DePaz noted Plaintiff had no complaints regarding any side effects from the medications.  Meloxicam and Lortab were discontinued; trial of Naprosyn and Oxycodone was started.  R. 569-70.  On August 17, 2009, Plaintiff reported not tolerating Oxycodone "well in that it caused itching and drowsiness" and Oxycodone was discontinued; he was continued on Naprosyn and restarted on Lortab.  Plaintiff and Dr. DePaz discussed Plaintiff's "goal of going to school for becoming a barber" and "[h]e is still hoping this can happen.  However, he has been unable to attend classes since taking the codeine due to drowsiness."  R. 554-55.  Plaintiff reported "good effect from the Naprosyn" on September 28, 2009.  R. 534.  On November 16, 2009, Plaintiff denied side effects from Lortab and Naproxen.  He had "[n]o rashes, hives or constipation."  He reported "his medications are working well."  R. 532; *see* R. 548 (December 24, 2009 (same re no side effects)); 546 (February 24, 2010 (Hydrocodone refilled; Naprosyn continued)); 545 (June 15, 2010 (Hydrocodone and Naprosyn noted)); 543 (September 13, 2010 (Hydrocodone refilled; Naprosyn discontinued)); 587-88 (January 5, 2011 (Hydrocodone refilled; Naprosyn discontinued; trial of Gabapentin)); 585-86 (March 4, 2011 (trial of Percocet and Mobic; continued Gabapentin; Hydrocodone discontinued); 583-84 (April 4, 2011 (Percocet and Mobic noted; Gabapentin increased)); 581-82 (May 2, 2011 (Percocet and Mobic discontinued (Percocet caused increased itching and made him sleepy)); Cymbalta samples caused mental status changes and discontinued; Gabapentin increased; Hydrocodone and Naprosyn restarted); 576-77 (October 11, 2011 (stable on pain regimen of Hydrocodone; Hydrocodone and Naprosyn noted); and 574-75 (January 16, 2012 (Hydrocodone and Naprosyn noted).  As of March 13, 2012, Plaintiff continued to deny, in part, having bowel/bladder disturbance, nausea, rashes, hives or constipation.  R. 572.  Naprosyn and Hydrocodone were continued.  R. 572-73.  As noted, there are some reports of side effects caused by medications.  It appears, however, that adjustments were made over time to Plaintiff's medications.

inconsistent with Dr. DePaz's own treatment records.  No other physician opined that the claimant is disabled, and no other physician imposed significant limitations upon him.  The expert opinions, with the exception of Dr. DePaz's, support a finding that the claimant is able to work.

At the first hearing, the claimant testified that he cooks soul food meals, does housework and drives.  [R. 88-89]  He said that he can walk two and a half blocks, and he admitted that he could stand for 30-45 minutes.  [R. 82]  He said he could sit for about an hour at a time.  [R. 83]  The claimant said that he could lift 10 to 15 pounds.  [*Id.*]  The claimant told Dr. DePaz that he was doing odd jobs.  The claimant told his physical therapist that he gardened, biked and worked out.  The claimant's activities of daily living support the finding that he is able to perform a reduced range of medium work.

Dr. Greenberg opined that the claimant exaggerated his symptoms.  The claimant testified that Hydrocodone caused itching, shaking, and sleepiness.  [R. 84]  However, he did not report any side effects to Dr. Depaz [sic].  [*See supra* n.8]  The claimant told Dr. Depaz [sic] on two occasions that he wanted to attend school to become a cosmetologist.  This vocational goal is contradictory to the pain and limitations that the claimant reported.  These contradictions cannot be resolved in the claimant's favor.  The claimant's lack of credibility is one factor considered in finding that the claimant is not disabled.

The claimant collected unemployment compensation for over a year.  [R. 255-58] (Exhibit 2D)  To receive unemployment benefits, an individual must attest that he is ready, willing and able to work, and the individual must report on a weekly basis that he is looking for work.  Either the claimant has been less than honest with me or he was less than honest with his unemployment reports.

Prior to his alleged onset date, the claimant's earnings record was inconsistent.  The claimant had no reported earnings in 2000, and his earnings were below substantial gainful activity levels in 2004 and 2006.  [R. 266] (Exhibit 3D)  Mr. Miller did not explain the gaps in his earnings record.  The claimant's earnings record does not support his claim that he is not disabled and unable to work.

R. 24-29.  The ALJ concluded that Plaintiff was unable to perform any past relevant work.  He also determined at step five, however, that Plaintiff could perform other work that was unskilled and required light exertion.  R. 29-31.

## V. Legal Analysis

**Substantial evidence supports the weight the ALJ accorded Dr. DePaz's opinion and further supports the ALJ's consideration of Plaintiff's credibility.**

### I.

Plaintiff argues the ALJ committed error by failing to give great weight to the opinion of Dr. DePaz, Plaintiff's treating physician, regarding Plaintiff's alleged inability to sit or stand or work with a sit stand option eight hours a day five days a week. Doc. 13 at 20-27.  Plaintiff further argues the ALJ erred when he did not find Plaintiff's reported pain credible.  *Id.* at 28-31.

The ALJ reviewed the record and found Plaintiff had severe impairments.  R. 23. After considering the medical and other evidence, the ALJ concluded that Plaintiff had the RFC to perform *medium* work, with exceptions.  The ALJ recognized, in part, that Plaintiff "needs the option to sit or stand, within the assigned workstation, every 45 minutes."  *Id.*  The ALJ, after receiving testimony from the vocational expert, determined that Plaintiff could not perform any past relevant work, but could perform other jobs in the national economy that were unskilled and with *light* exertion.[9]  R. 29-30, 58-60.

In May 2008, after referral from Dr. Berk, Dr. Powell, a board-certified orthopedic surgeon, examined Plaintiff for his complaint of right wrist pain.  R. 362-64. Examination and x-rays showed no evidence for significant arthritis except at the MP

---

[9]  The ALJ determined that Plaintiff's ability to perform all or substantially all of a full range of medium work has been impeded by additional limitations.  R. 30. Accordingly, in order to determine the extent to which these limitations eroded the unskilled medium occupational base, the ALJ asked the vocational expert whether jobs existed in the national economy for an individual with Plaintiff's age, education, work experience, and RFC.  *Id.*  The vocational expert opined that Plaintiff could perform several representative unskilled jobs in the national economy that required light exertion.  *Id.*

joint of the thumb which was pre-existing.  Dr. Powell continued Plaintiff on light duty

noting that he would be able to return to full duty shortly.  R. 364.  During a follow-up

visit with Dr. Powell in July 2008, Plaintiff admitted that he was able to use his right wrist

for light activities.  Dr. Powell noted that Plaintiff could perform work at medium exertion.

R. 359, 386, 393.  In September 2008, Dr. Powell completed a form stating that the

Plaintiff reached maximum medical improvement as of August 6, 2008, and agreed with

the functional capacity evaluation finding that Plaintiff could work at medium exertion.

R. 386, 393.  The ALJ gave *controlling weight* to this opinion "because it is consistent

with the treatment records, and is consistent with the medical evidence of record.  The

imaging studies, physical examinations, and the claimant's activities of daily living are

consistent with the ability to perform a reduced range of medium work."[10]  R. 27.

In March 2009, at the request of the state agency, Dr. Chodosh performed a

consultative physical examination and evaluation of Plaintiff.  R. 488-95.  After receiving

a history from Plaintiff, Dr. Chodosh examined Plaintiff and opined that there were no

signs of significant impairment and reported no significant clinical abnormalities on

examination.  R. 491.  He opined that Plaintiff had no ability to stand, walk, sit, stoop,

squat, kneel, lift, and carry.  *Id.*  The ALJ gave *substantial weight* to this assessment

"because it is consistent with the greater weight of the evidence which shows the

claimant's ability to drive, garden, cut grass, and do light housework."  R. 26-27.

In June 2009, Dr. Greenberg performed a consultative physical evaluation.

---

[10]  The ALJ noted that Plaintiff "saw Dr. Berk and Dr. Powell, an orthopedist and
an orthopedic surgeon respectively, for his wrist injury.  He was treated and discharged
from both practices."  R. 28; *see* R. 24 (summary of Plaintiff's treatment with Dr. Berk).

R. 512-15.  Plaintiff reported problems with bilateral knee pain, low back pain, and pain

in the right upper extremity.  R. 514.  Dr. Greenberg opined that Plaintiff was not putting

forth full effort with regard to strength testing.  R. 515.

> With that in mind, Dr. Greenberg wrote that the claimant had decreased range of
> motion of the hips, knees, and lumbar spine.  There was full range of motion of
> the other joints.  [R. 515]  There was pain on range of motion of the hips, knees
> and lumbar spine as well as pain on palpation of the knees; however, there was
> no swelling, redness or evidence for active, inflammatory arthritis.  Fine
> manipulation of the claimant's hands was normal.  Dr. Greenberg said the
> claimant "complained bitterly" of pain.  Dr. Greenberg opined that the claimant's
> complaints were out of proportion to the physical findings.  [*Id.*]  (Exhibit 9F)
> *Substantial weight* is given to this assessment because it is consistent with the
> greater weight of the evidence, which shows that the claimant has functional
> motion in his knees, mild to moderate degenerative changes in his lumbar spine,
> and full strength in his extremities.

R. 27 (emphasis added); *see* R. 29 ("Dr. Greenberg opined that the claimant

exaggerated his symptoms.").

The ALJ referred to Plaintiff's hearing testimony during the first and second

hearings, R. 24, 28-29, other medical evidence including 2008 MRI results of Plaintiff's

right wrist, R. 24; 2009 x-rays of Plaintiff's lumbar spine and right knee, R. 25-26; 2008

functional capacity evaluation with Debbi Shon, MPT, R. 27; 2009, RFC assessment

completed by DDS consultant, Marc Tafflin, D.O., *id.*; 2012 x-ray of Plaintiff's and right

knee, R. 26; and a 2012 physical therapy intake interview/evaluation and sessions,

R. 26.

Importantly, the ALJ considered Dr. DePaz's treatment notes, R. 25-29, and

Plaintiff does not argue that the ALJ ignored any material facts.  Doc. 13.  The ALJ

noted that Dr. DePaz opined in an April 30, 2012, RFC assessment, and after the

second hearing, that Plaintiff "is non-employable."  R. 28.  The ALJ gave this opinion

"[l]ittle weight" and explained the bases for this assessment.

This opinion is inconsistent with opinions from other sources that find that the claimant is able to do medium work.  Dr. DePaz assessed pain levels in the opinion despite the fact that he never did so in his treatment notes.  Dr. DePaz stated in the opinion that he treated the claimant for a chronic pain syndrome, but this treatment is not documented in the treatment notes.  In general, the limitations given do not match what has been recorded in the treatment notes.  Additionally, Dr. DePaz's opinion is inconsistent with the activities that the claimant disclosed to his physical therapist such as gardening, working out and biking.

R. 28.  The ALJ continued his analysis of the evidence in light of Plaintiff's claim of

disability.

The medical evidence of record does not support the claimant's assertion that he is disabled.  The imaging studies of the claimant's back show only mild to moderate degenerative changes.  The claimant reported good symptom relief when using Hydrocodone and Naprosyn.  He told Dr. DePaz that Neurontin caused him to be sleepy until early afternoon.  The claimant testified that his medications caused drowsiness and constipation, but he did not report these issues to Dr. DePaz.  [*See supra* n.8]  The claimant told Dr. DePaz that he had Medicaid, but there is little evidence that the claimant sought treatment for his diabetes and related symptoms, which is counterintuitive to his claim of disability.  The medical evidence of record supports the finding that the claimant is able to perform a reduced range of medium work.

The claimant saw Dr. Berk and Dr. Powell, an orthopedist and an orthopedic surgeon respectively, for his wrist injury.  He was treated and discharged from both practices.  Dr. Powell opined that the claimant could work at medium exertion.  The claimant was treated by Dr. Depaz [sic], a rehabilitation specialist.  After the second hearing, Dr. DePaz opined that the claimant is disabled which contradicts the treatment notes in general and specifically from May [sic] [June] 2010 when the claimant said he had been doing well until he fell in the yard.  When examined that day, the claimant had functional range of motion in the knee, and there was no edema.  [R. 545]  That opinion has been discounted because it is inconsistent with Dr. DePaz's own treatment records.  No other physician opined that the claimant is disabled, and no other physician imposed significant limitations upon him.  The expert opinions, with the exception of Dr. DePaz's, support a finding that the claimant is able to work.

At the first hearing, the claimant testified that he cooks soul food meals, does housework and drives.  [R. 88-89]  He said that he can walk two and a half blocks, and he admitted that he could stand for 30-45 minutes.  [R. 82]  He said he could sit for about an hour at a time.  [R. 83]  The claimant said that he could lift 10 to 15 pounds.  [*Id.*]  The claimant told Dr. DePaz that he was doing odd jobs.  The claimant told his physical therapist that he gardened, biked and

worked out.  The claimant's activities of daily living support the finding that he is able to perform a reduced range of medium work.

Dr. Greenberg opined that the claimant exaggerated his symptoms.  The claimant testified that Hydrocodone caused itching, shaking, and sleepiness. [R. 84]  However, he did not report any side effects to Dr. Depaz [sic].  [*See supra* n.8]  The claimant told Dr. Depaz [sic] on two occasions that he wanted to attend school to become a cosmetologist.  This vocational goal is contradictory to the pain and limitations that the claimant reported.  These contradictions cannot be resolved in the claimant's favor.  The claimant's lack of credibility is one factor considered in finding that the claimant is not disabled.

The claimant collected unemployment compensation for over a year.  [R. 255-58] (Exhibit 2D)  To receive unemployment benefits, an individual must attest that he is ready, willing and able to work, and the individual must report on a weekly basis that he is looking for work.  Either the claimant has been less than honest with me or he was less than honest with his unemployment reports.

Prior to his alleged onset date, the claimant's earnings record was inconsistent. The claimant had no reported earnings in 2000, and his earnings were below substantial gainful activity levels in 2004 and 2006.  [R. 266]  (Exhibit 3D) Mr. Miller did not explain the gaps in his earnings record.  The claimant's earnings record does not support his claim that he is not disabled and unable to work

R. 28-29.  Contrary to Plaintiff's argument, the ALJ provided sound reasons for giving

DePaz's opinion "[l]ittle weight" and the ALJ's determination is supported by substantial

evidence.  No error has been shown.

## II.

Plaintiff also contends that the ALJ did not properly evaluate his subjective

complaints of pain.  Doc. 13 at 28-31.  The ALJ complied with the regulations for

evaluating pain and other symptoms and provided sufficient reasons supported by

substantial evidence.  R. 24-29.

The ALJ reviewed the record as a whole and reasonably concluded Plaintiff's

allegations of disability, including his subjective complaints of pain, were not entirely

credible.  R. 24-29.  Using arguably conclusory boilerplate language, *see supra* n.5, the

ALJ concluded that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but found his statements concerning the intensity, persistence and limiting effects of these symptoms are not credible.  R. 24. This conclusion does not sit isolated and without evidentiary support.  The ALJ explained his reasoning for this conclusion throughout his decision.  R. 24-29.  The ALJ's credibility findings are intertwined with a thorough discussion of the medical evidence and Plaintiff's claims of disability.  *Id.*

As explained above, the ALJ gave controlling weight to Plaintiff's orthopedic surgeon, Dr. Powell, who opined Plaintiff could perform medium work, and substantial weight to the opinion of Dr. Chodosh, who performed a consultative examination and opined Plaintiff had normal ability to do work-related activity.  R. 26-27, 359, 386, 393, 491.  The ALJ noted Dr. Greenberg performed a consultative examination and noted Plaintiff's subjective complaints were out of proportion to the physical findings. R. 27, 515.  The ALJ further noted that Plaintiff's diagnostic tests showed only mild-to-moderate degenerative changes.  R. 28, 585, 628, 630.  The ALJ noted Plaintiff's level of activity undermined his allegations of disability.  R. 29.  The ALJ noted that Plaintiff cooked, did housework, drove, did side jobs, gardened, biked, and worked out.  R. 27-29, 47-48, 88-89, 488, 579, 651-52, 654-55.  The ALJ noted Plaintiff received some relief with medication.  R. 28, 532, 548.  The ALJ also indicated that Plaintiff had collected unemployment compensation for over a year and had inconsistent earnings records.  R. 29.

In the Eleventh Circuit, the ALJ is not required to include "particular phrases or formulations" regarding a credibility determination as long as sufficient information is

given to show that the ALJ considered Plaintiff's medical condition as a whole.  Dyer v. Barnhart, 395 F.3d 1206, 1210 (11th Cir. 2005).  Although the ALJ included some boilerplate credibility language as noted above, *see supra* n.5, the ALJ went well beyond and discussed objective and non-objective evidence when re-counting Plaintiff's allegations of disability including his record statements of pain.

Finally, as part of his second argument, Plaintiff argues the record contains evidence showing Plaintiff's height and weight and his back, leg, right wrist, and right shoulder pain.  Doc. 13 at 31.  Plaintiff does not explain how this evidence undermines the ALJs credibility finding.  *Id.*  The ALJ acknowledged that Plaintiff had several severe impairments such as osteoarthritis of the knees, status post-knee surgery, diabetes mellitus neuropathy, degenerative disc disease of the lumbar spine, and a history of right wrist injury.  R. 23.  Nevertheless, the ALJ reasonably concluded Plaintiff could perform a range of medium work and properly discounted Plaintiff's subjective allegations of disabling pain based on the record as a whole.

The ALJ's credibility findings are both explicit and supported by citation to specific evidence that provide a reasonable basis for partially rejecting claimant's testimony.  Dyer v. Barnhart, 395 F.3d at 1212.  "The question is not . . . whether [the] ALJ could have reasonably credited [claimant's] testimony, but whether the ALJ was clearly wrong to discredit."  Werner v. Comm'r of Soc. Sec., 421 F. App'x 935, 939 (11th Cir. 2011) (unpublished).  The ALJ did not err in finding Plaintiff not entirely credible as to his allegations of pain and functional limitations and "substantial evidence cited by the ALJ supports the adverse credibility determination."  *Id.* at 938.

Substantial evidence supports the ALJ's RFC determination that Plaintiff could perform a range of medium work.  R. 23-29.  Plaintiff does not claim that the ALJ erred imposing a hypothetical question to the vocational expert, *see* R. 57-58, nor does he argue that the ALJ erred in concluding at step five, and based in part on the vocational expert's testimony, that Plaintiff was not disabled because he could perform a significant number of other representative unskilled jobs the national economy in a particular that could be performed with *light* as opposed to medium exertion.  R. 30-31.

## VI. Conclusion

Considering the record as a whole, the findings of the ALJ are based upon substantial evidence in the record and the ALJ correctly applied the law.  Accordingly, it is respectfully recommended that the decision of the Commissioner to deny Plaintiff's application for Social Security benefits be **AFFIRMED** and judgment entered for the Defendant.

**IN CHAMBERS** at Tallahassee, Florida, on August 27, 2014.


s/ Charles A. Stampelos
**CHARLES A. STAMPELOS**
**UNITED STATES MAGISTRATE JUDGE**


**NOTICE TO THE PARTIES**

**A party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 14 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**